STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

07-354


CAMO CONSTRUCTION CO., INC.

VERSUS

TOWN OF VIDALIA


**********

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. 39589
HONORABLE LEO BOOTHE, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Michael G. Sullivan, Judges.

AFFIRMED.

Ronald J. Fiorenza
Provosty, Sadler, deLaunay, Fiorenza & Sobel
P. O. Drawer 1791
Alexandria, LA 71309-1791
Telephone:  (318) 445-3631
COUNSEL FOR:
       Defendant/Appellee - Town of Vidalia

Richard Brooks Easterling
450 Laurel Street - Suite 1900
Baton Rouge, LA 70801
Telephone:  (225) 336-5200
COUNSEL FOR:
       Plaintiff/Appellant - CAMO Construction Co., Inc.

**THIBODEAUX, Chief Judge.**

This case involves a contract dispute between the plaintiff-appellant, CAMO Construction Company, Inc., (CAMO) and the defendant-appellee, the Town of Vidalia (Town). In January of 2001, CAMO was awarded the contract for a street improvement and drainage project in Vidalia, Louisiana which called for completion in 270 days. The project was plagued with delays from the beginning and after two extensions of time was still not complete. The Certificate of Substantial Completion was issued 1007 days after the start date on the contract.

During construction, CAMO instituted a claim for extended overhead and delay damages of $221,634.04, later reduced to $141,681.59. At the end of the project, the Town rejected the claim and deducted $80,000.00 from CAMO's last payment as liquidated damages for 160 of the days that CAMO went beyond the last approved extension date on the contract.

CAMO filed suit for breach of contract in April 2004 seeking to recover the liquidated damages and the funds claimed for overhead and delay damages. After a bench trial, the trial court found in favor of the Town and dismissed all of CAMO's claims. CAMO filed this appeal. For the reasons set forth below, we affirm the judgment of the trial court.

I.

**ISSUES**

We must decide:

(1)  whether the trial court erred in finding that CAMO Construction Company, Inc. was not entitled to additional payments for delays and extended overhead on the construction project for the Town of Vidalia; and

> (2) whether the trial court erred in finding that the Town was entitled to deduct from CAMO's final payment liquidated damages for 160 days at $500.00 per day.

## II.

## FACTS AND PROCEDURAL HISTORY

In early January of 2001, the Town invited bids on a construction project entitled, "Town of Vidalia 1999 Street Improvement Program, Phase II-Subsurface Drainage." The Town estimated that the project would require funds of $2,445,016.00 and that the construction would take 270 days. CAMO Construction submitted the lowest overall bid, at $2,165,976.50 and was awarded the contract. In general, the project called for the installation of catch basins and various sizes of PVC pipe in open ditches, and then required covering the installations with dirt and sod, called "dressing up." The new installations were tied into, and sometimes replaced, existing subsurface drainage systems, at times requiring the breaking up and repair of private driveways.

The contract documents called for "unit price" bids, not cost plus bids, or price per hour bids. The bid forms were pre-printed with the description of each item, the estimated quantity of that item needed for the project, and the measurement unit for that item (linear foot, square yard, cubic yard, etc.). Blanks were provided at the end of each line item for the contractor to write in his "unit price" bid and his "total price" bid for that item. The contractors "unit price" bid was his price for each item installed, that is, *after installation*. Therefore the "unit price" bid for each item specifically included the cost of the material, the labor, the contractor's overhead, profit, taxes, insurance, bond premiums, equipment rentals, and any other contractor costs associated with the installation.

For example, in one instance, 3,670 linear feet of fifteen-inch (15") inch pipe, was bid by CAMO at $17.88 per linear foot *installed*. Although not shown on the bid form, the purchase price (or unit *rate*) for this pipe was $5.60 per linear foot at one time during the project. The $17.88 per unit bid by CAMO is called the "unit price" and is then multiplied times the 3,670 linear feet indicated on the bid form, for a "total price" bid of $65,619.60 for that item (15" pipe). The original bid form contained eighteen (18) line items which included five sizes of corrugated PVC pipe, catch basins, inline drains, driveway repair, asphalt street repair, sand/clay/gravel, and other materials. Item 17 was a "utility relocation" lump sum cash allowance pre-set on the bid form at $2,000.00. Item 18 asked for a lump sum bid for "mobilization." The pre-printed quantities on the bid form were estimates only. CAMO would be paid for actual quantities installed based upon its "unit price" bid for each item.

Page two (2) of the bid packet signed by CAMO contained the following language:

> The Bidder, in compliance with your Advertisement for Bids . . . having examined the plans and specifications with related documents and the site of the proposed work, and being familiar with all of the conditions surrounding the construction of the proposed project including the availability of materials and labor, hereby proposes to furnish all labor, materials, and supplies, and to construct the project in accordance with the contract documents within the time set forth therein and at the prices stated below. These prices are to cover all expenses incurred in performing the work required under the contract documents, of which this proposal is a part.
>
> . . . .
>
> BIDDER hereby agrees to commence WORK under this contract on or before a date to be specified in the written NOTICE TO PROCEED and to fully complete the PROJECT with[in] 270 consecutive calendar days thereafter. BIDDER further agrees to pay as liquidated damages, the sum of $500.00 for each consecutive calendar

day thereafter as provided in Section 9 of the Information for Bidders.

Bryant Hammett and Associates, the engineering firm, was responsible for plan designs and drawings, materials lists, bid and contract documents and specifications, and supervision and administration of the project. The only two signatories on the two-page contract document setting forth the price, the completion time, and the amount for liquidated damages, were the CONTRACTOR (CAMO Construction) and the OWNER (Town of Vidalia through its Mayor, Hyram Copeland).

The notice to proceed was issued on January 31, 2001, and provided a construction start date of March 6, 2001. Since the construction contract required completion of the project in 270 days, the contract between the Town and CAMO had a completion date of December 1, 2001, which means that the project must be "substantially complete" by the designated date. Basically, the contractor notifies the owner that he is finished; the owner conducts a pre-final inspection, and issues a Certificate of Substantial Completion.

In addition to the provision in the bid packet, the contract document itself provided for liquidated damages in the form of a $500.00 per diem charge against the contractor for every day that the project ran over the completion date on the contract. However, the entire contract, which contained four parts – Contract and Bid Documents, General Conditions, Special Conditions, and Technical Specifications – provided specific mechanisms for adjusting the contract *price* and the completion *time*, due to inevitable delays and unforseen costs as the project progressed. Those mechanisms are defined under Section 1.01 on page one of the General Conditions (GC-1) as a *Change Order* and a *Claim*, as follows:

4

9. *Change Order* – A document recommended by ENGINEER which is signed by CONTRACTOR and OWNER and authorizes an addition, deletion, or revision in the Work or an adjustment in the Contract Price or the Contract Times, issued on or after the Effective Date of the Agreement.

10. *Claim* – A demand or assertion by OWNER or CONTRACTOR seeking an adjustment of Contract Price or Contract Times, or both, or other relief with respect to the terms of the Contract. A demand for money or services by a third party is not a claim.

The project was besieged with delays from the beginning. CAMO began ordering materials, and sent drawings for the catch basins and drain tops to the fabricator for review when the notice to proceed was issued. It was soon discovered that the catch basins could not be fabricated because the pipe to be installed was too big to go in the basin elevations that had been supplied on the drawings by the engineers. After lengthy discussions with the project engineer, CAMO was still corresponding with the fabricator in mid-March 2001 about the various pipe sizes and the minimum depth for the coordinating catch basins. CAMO did not begin construction at the work site until June 11, 2001.

Once construction began, it became apparent that the eighteen-inch (18") PVC pipe ordered pursuant to the plans and specifications was too large for the intended ditches. Therefore, a large amount of this pipe was unusable. There were also problems with the elevations prepared by surveyors with the engineering firm, and CAMO could not tie the new pipe into the existing pipes and cross-drains. CAMO began taking the elevations in the field and adjusting the pipe as it was laid. This process is called "field engineering." CAMO also encountered underground gas, sewer, and water lines that were not accurately marked on the drawings, requiring the relocation by the Town of some of the utilities, and circumvention by CAMO of others. The project was far from completion by the original deadline of

December 1, 2001. On December 13, 2001, the engineering firm wrote CAMO asking it to provide a written request for additional time to complete the project.

On December 20, 2001, with the Hammett firm's recommendation, Change Order No. 1 was issued granting an additional 200 days for completion of the project, thereby extending the contract period to 470 calendar days, with a beginning date of March 6, 2001 and a completion date of June 19, 2002. The reasons listed for the change order were: (1) delays in material deliveries; (2) delays in material fabrication; (3) extreme weather conditions; and, (4) conflicts with existing underground utilities.

On January 29, 2002, Change Order No. 2 was issued due to a decision by the Town to delete Bid Item 12 - "trench repairs with sod." CAMO's unit price for that item was $87,108.00. Therefore, the contract price was reduced from $2,165,976.50 to $2,078,868.50. CAMO had no objection to this deletion, and the change order was approved. The contract time of 470 days remained the same, as did the completion date of June 19, 2002.

Problems continued in 2002. CAMO met with Hammett in mid-January to discuss the project needs. The conflicts with underground utilities, and problems with inlets and catch basins continued. Too many catch basins had been ordered; discussions were underway for a new design on the inlets; and CAMO suggested modifying some of the extra basins in order to use them. At some point a switch was made from concrete basins to plastic basins. There were continued delays due to material fabrication. CAMO lost a month due to adverse weather conditions. The Hammett engineering firm wrote CAMO twice in July of 2002, advising CAMO to provide another written request for more time, since the contract had expired on June 19, 2002.

Change Order No. 3 was issued on September 3, 2002, two-and-a-half months after the June 19, 2002 deadline. This change order added 320 days to the original contract time, resulting in a contract period of 790 calendar days, from March 6, 2001 to May 5, 2003. The reasons for Change Order No. 3 were the same as those stated on Change Order No. 1 - delays in material deliveries and material fabrication, weather conditions, and conflicts with underground utilities.

Hammett had begun drawing new plan designs on August 30, 2002. While the plan revisions were underway, CAMO could not install pipe but was able to work on punch list items. CAMO reported the punch list complete on October 8 and requested the new drawings. Hammett sent the revised plan drawings and new materials list on October 9, 2002. The revised plans called for the installation of additional units of fifteen-inch (15") pipe and also added twelve-inch (12") pipe and side drains to the project. Once the new materials were ordered, there were some delays waiting for their delivery. The fifteen-inch (15") pipe had gone up in price by $1.41 per linear foot since CAMO bid the job in January of 2001. The Town agreed to pay CAMO the higher unit price on this bid item.

Change Order No. 4 was submitted on December 2, 2002, to increase the contract price for four new line items, Items 19-22, for the installation of 6,895 linear feet of fifteen-inch (15") pipe, 870 linear feet of twelve-inch (12") pipe, 51 side drains with pads and grates, and the 88 side drains on the punch list. Pursuant to this change order, the contract price was increased by $280,164.65, which was CAMO's price for installing the new items, which were mostly the result of the plan revisions. The change order also decreased the contract price due to deletions of certain items for a net increase of $209,969.65. Originally, the deletions were incorrect, and the change order was subsequently corrected to the price here stated. Change Order No.

4 brought the contract price up to $2,288,838.15. It did not add any days to the contract, and the completion time remained at 790 days with the completion date of May 5, 2003.

On December 13, 2002, CAMO wrote Hammett requesting the resolution of five items revolving around CAMO's extended overhead due to the delays and to alleged costs associated with excessive field engineering. However, none of the claims were quantified. CAMO considered the letter a claim and requested a meeting the following week to discuss the specific items. The meeting took place, but it was agreed that CAMO would keep working and the claims would be revisited.

On May 2, 2003, three days before the latest extension expired on May 5, 2003, Hammett wrote CAMO expressing the Town's concern that the project would not be completed that summer. Hammett noted the two previous time extensions and asked CAMO to submit a completion schedule detailing the work remaining and the time frame for completing the project. Hammett also asked CAMO to submit a written explanatory request for more time.

CAMO responded in correspondence dated May 19, 2003, summarizing the reasons for the previous extensions, but wanted to know whether streets previously discussed as possible additions to the project were going to be added, before providing a new extension time. CAMO never did provide a request in writing to the engineer for an additional extension of time. In this letter of May 19, CAMO also expressed concern about the outstanding issues in its December 13, 2002 letter. In a separate letter dated the same day, CAMO asked for a new punch list. Hammett mailed a four-and-one-half page punch list on June 20, 2003.

Several letters were exchanged between Hammett and CAMO between July 17, 2003 and October 27, 2003. These communications prompted the Mayor to

instruct Hammett to attempt a compromise of the claim for extended overhead and delay damages.

A meeting between Hammett and CAMO resulted in a reduction of these claims from $221,634.04 to $141,681.59 and an additional claim for $20,926.44 for removal of the leftover materials to the Town's storage facility. This was confirmed in writing on October 27, 2003. On October 30, 2007, CAMO requested from Hammett a Certificate of Substantial Completion.

On November 19, 2003, the project engineer for Hammett, Keith Capdepon, wrote CAMO referencing CAMO's October 27, 2003 letter containing the revised numbers and stating that the revised cost breakdown was approved. He further indicated that a change order would be issued showing the cost breakdown and adding it to the final estimate for payment.

On November 19, 2003, Change Order No. 5 was prepared and subsequently signed by Bryant Hammett and CAMO, adding 217 days to the contract period that had expired on May 5, 2003. This change order would result in a contract period of 1007 calendar days and extend the contract completion date to December 8, 2003. Change Order No. 5 also contained a change in the contract price that reflected the *deletion* of leftover, uninstalled materials, in the amount of $485,459.60, and the *addition* of CAMO's revised cost breakdown of $162,608.03. The new contract price according to this change order was $1,985,986.58. However, Change Order No. 5 was never signed by Mayor Copeland on behalf of the Town. While the change order contains an issue date of November 19, Hammett was still trying to confirm the figures with CAMO on December 13, 2003, and the change order was not submitted to the Town by Hammett until December 17, 2003.

On November 26, 2003, the pre-final inspection that was attempted on October 9, 2003, was rescheduled for December 9, 2003.

On December 8, 2003, Hammett generated a final punch list for CAMO, and December 8, 2003 was determined to be the date of substantial completion of the project. CAMO signed the Certificate of Completion on December 16, 2003.

On December 17, 2003, Hammett submitted correspondence to Mayor Copeland attaching a twenty-third and final payment request and original Change Order No. 5, both of which incorporated a $162,608.03 payment to CAMO for the revised cost breakdown (extended overhead and delay costs of $141,681.59 plus $20,926.44 for moving excess materials to storage). The December 17, 2003 letter also attached Revised Change Order No. 4 as previously indicated.

On December 31, 2003, the Town's comptroller, Kenneth J. Davis, wrote CAMO, stating that the December 17, 2003 items had been reviewed for payment, but more information was needed from the engineers before a final determination could be made.

In January of 2004, the Town's comptroller wrote CAMO indicating that CAMO's final payment would not include the $141,681.59 cost breakdown claimed for extended overhead and delay damages, as the figures seemed arbitrary, and as the contract was bid as a unit price contract. The letter stated that such a payment would convert the contract to a cost plus contract and cause severe ramifications for the Town. The Town further indicated that it would deduct the amount of $108,500.00 from CAMO's final payment as liquidated damages for the 217 days that CAMO had run over the contract period ($500.00 per day). The Town explained that its work summaries indicated that CAMO had only worked 389 days on the project, and that,

10

even with an allowance for 107 rained out days, such a schedule did not justify the 217-day extension sought in Change Order No. 5.

On March 4, 2004, CAMO's attorney wrote the City Attorney asserting that CAMO's records indicated 435 days on the job and that CAMO was entitled to the extra cost because it based its bid on only 270 days of work. He indicated that CAMO was not seeking additional costs for days not worked, or for delays caused by waiting on materials and waiting on revised plans, but rather for extra days working on the project due to delays beyond CAMO's control.

On April 2, 2004, the Town comptroller, Mr. Davis, wrote CAMO's attorney presenting the Town's adjustment to the Change Orders and the estimate for payment number 23. The Town had deducted $80,000.00 for 160 days of liquidated damages, instead of $108,500.00 for 217 days of damages for exceeding the contract period, and had approved Revised Change Order No. 4. It had deleted the $162,608.03 cost breakdown from Change Order No. 5 and from the estimate for payment number 23, but indicated that it would pay the portion of that breakdown that represented the cost of $20,926.44 for moving the leftover materials. It requested that this amount be billed outside of the contract. Hence, CAMO's claim for extended overhead and delay damages was denied. The Town indicated that it had issued a check to CAMO for a balance due of $207,168.65, which included a negative balance of -$31,052.33 on the contract, due to the deduction of damages, and a payment of plus $20,926.44 for moving the excess materials, and plus $217,568.10 for the installed price of the excess materials, which were paid outside the contract.

III.

## LAW AND DISCUSSION

### Standard of Review

An appellate court may not set aside a trial court's findings of fact in absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A two tiered test must be applied in order to reverse the findings of the trial court:

> a.   the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
>
> b.   the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).

*Mart v. Hill*, 505 So.2d 1120 (La.1987).

Even where the appellate court believes its inferences are more reasonable than the fact finders, reasonable determinations and inferences of fact should not be disturbed on appeal. *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). Additionally, a reviewing court must keep in mind that if a trial court's findings are reasonable based upon the entire record and evidence, an appellate court may not reverse said findings even if it is convinced that had it been sitting as trier of fact it would have weighed that evidence differently. *Housely v. Cerise*, 579 So.2d 973 (La.1991). The basis for this principle of review is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts.

### Claims for Extended Overhead and Delay Damages

CAMO contends that the trial court erred in finding that it was not entitled to additional costs for extended overhead and delays beyond its control on

12

the construction project. The record reveals that the delays to which CAMO refers began *before* the authorized start date on the contract of March 6, 2001. Yet, CAMO did not provide a written request for compensation until December 13, 2002, *after* it had received three change orders compensating CAMO in both time and price for the costs and delays alleged.

More specifically, Mike Grantham, President of CAMO, testified that around the time that the notice to proceed was issued on January 31, 2001, he began ordering materials, and it was soon determined that the catch basins could not be fabricated because the pipe to be installed was too big to go in the basin elevations. Grantham had lengthy discussions with the engineers and the fabricator and wrote the fabricator on March 15, 2001, regarding the various pipe sizes and the minimum depth for the coordinating catch basins that were needed. Accordingly, he did not begin construction until June 11, 2001. Once on the site it became apparent that the eighteen-inch (18") pipe was too big and "riding out" of the ditches, and he began running into underground utilities not accurately marked on the engineer's drawings.

Grantham began making changes in the field, called "field engineering," from the very beginning. By September 3, 2002, Change Order No. 1 and Change Order No. 3 had been issued giving him 200 and 320 additional days, respectively, for a total of 520 additional days on the contract. The reasons for both change orders were: (1) delays in material deliveries; (2) delays in material fabrication; (3) extreme weather conditions; and, (4) conflicts with existing underground utilities. The September 3, 2002 change order was accompanied by a cover letter from Bryant Hammett specifically recommending the additional days. The drawings were being revised at the time of the September 3, 2002 change order, and on December 2, 2002, Change Order No. 4 was issued in order to compensate CAMO its quoted price of an

13

additional $280,164.65 for modifications and the installation of new materials due to the changes in the plans not previously part of the original contract.

Eleven days later, on December 13, 2002, CAMO wrote Hammett the letter, now being characterized as the claim. The letter requested resolution of: (1) extended overhead for the delays listed in Hammett's September 3, 2002 letter; (2) delays due to conflicts with utilities and other obstructions; (3) delays due to work stoppage for material revisions and deliveries; (4) costs due to excessive field engineering for installation of pipe, catch basins, and inlets; (5) demobilization and remobilization due to revision of drawings from August 30, 2002 to October 9, 2002.

The trial court agreed with the Town's position that CAMO was granted both time extensions and additional compensation for the items in the claim in three previous change orders. Specifically, following two extensions of time in Change Orders No. 1 and in Change Order No. 3, Change Order No. 4 increased the contract by a net figure of $209,969.65 in order to pay CAMO $280,164.65 for the installation of new material due to plan revisions and to pay CAMO its quoted price for modifying some of the excess catch basins. Moreover, as the Town points out in its brief, the Town paid CAMO for all of the excess catch basins that CAMO allegedly ordered as a result of the duplication error on the plans. In fact, CAMO was paid the installed price of the leftover materials.[1] We also note that while the revisions during construction led to the *addition* of certain installations to the original contract that

_____

[1] The evidence reveals that CAMO was paid the *installed* price of all of the leftover catch basins, pipe, and other materials that CAMO ordered and moved to the Town's storage barn at the end of the project, even though CAMO did not actually install these materials. The cost of the leftover material was $173,967.50, and CAMO was paid $217,568.10 for the material, the difference being $15,222.16 (8.75%) for taxes, plus $28,378.45 (15%) for profit and overhead. Additionally, CAMO was paid its requested price of $20,652.88 for moving the material to storage. These payments to CAMO were not reflected in the change orders presumably because these materials were not installed as part of the project. CAMO was paid for these items outside of the contract. However, the unit price bid for these materials was included in the overall reductions in the contract price.

were not part of CAMO's original bid, the revisions also caused the *deletion* of certain installations that CAMO had bid in the original contract. That is the reason for change orders – to document revisions in the work as it progresses, to adjust time and prices as needed, and to pay the contractor his unit price for items actually installed. In the end, in this case, there were more deletions than additions of work.

With regard to CAMO's claim for cost of demobilization and remobilization between August 30 and October 9 of 2002 while the engineers revised the plan drawings, the Town's comptroller gathered documentation from the project engineer, Capdepon, stating that CAMO was working on a preliminary punch list during that time in the Southern part of town where subsurface drainage had already been installed and needed dressing up. Hammett testified at trial that his understanding was that CAMO was working on a punch list except for about two days during that time. This information is confirmed by CAMO's letter from Grantham to Capdepon, the project engineer, dated October 8, 2002, stating that "We have completed the punch list . . . we are ready to proceed with the completion of the project and are awaiting the revised drawings." The following day, October 9, 2002, a letter from Capdepon to Grantham encloses the requested drawings.

Moreover, Grantham testified at trial that during the plan revisions, they could not install pipe so they dropped back and worked on punch list items. We note that Change Order No. 4, issued on December 2, 2002 adds four Items to the contract, Items 19-22. Items 19-21 are for the new installations pursuant to the revised plans provided in October. The last item is described thusly: "Item 22 side drain (punch list) were side drains installed by contractor after pipe had been laid." Out of the total of $280,164.65 paid to CAMO for the four additional items on Change Order No. 4, Item 22 for the punch list items represents $88,484.00 of that amount.

15

We note that at the end of the project, the final contract price shown on Revised Change Order No. 5 and on the final payment summary is $1,823,378.55, which is less than CAMO's bid of $2,165,976.50. This is because there were more deletions of work due to revisions than additions to the work because of revisions. We also note that, even though the final contract price was $1,823,378.55, the total payments to CAMO were $1,981,599.53, due to the payment to CAMO for the leftover materials. As is evident in the record, CAMO did not submit a price per hour bid or a cost plus bid. The bid packet specifically invited only unit price bidding, and the bid proposal is entitled "Bid for Unit Price Contracts."

General Conditions to the Contract, Section 11.03, entitled "Unit Price Work," provides as follows:

> A. Where the Contract Documents provide that all or part of the Work is to be Unit Price Work, initially the Contract Price will be deemed to include for all Unit Price Work an amount equal to the sum of the unit price for each separately identified item of Unit Price Work times the estimated quantity of each item as indicated in the Agreement. *The estimated quantities of items of Unit Price Work are not guaranteed and are solely for the purpose of comparison of Bids and determining an initial Contract Price.* Determinations of the actual quantities and classifications of Unit Price Work performed by CONTRACTOR will be made by ENGINEER subject to the provisions of paragraph 9.08.
>
> B. Each unit price will be deemed to include an amount considered by CONTRACTOR to be adequate to cover CONTRACTOR's overhead and profit for each separately identified item.
>
> C. OWNER or CONTRACTOR may make a Claim for an adjustment in the Contract Price *in accordance with paragraph 10.05 if*:
>
> > 1. the quantity of any item of Unit Price Work performed by CONTRACTOR differs materially and significantly from the estimated quantity of such item indicated in the Agreement; *and*

> 2. *there is no corresponding adjustment with respect [to] any other item of Work; and*
>
> 3. if CONTRACTOR believes that CONTRACTOR is entitled to an increase in Contract Price as a result of having incurred additional expense or OWNER believes that OWNER is entitled to a decrease in Contract Price and the parties are unable to agree as to the amount of any such increase or decrease.

(All emphasis ours.)

Based upon the foregoing, CAMO's argument fails. Section 11.03(C) provides that the contractor can make a claim for an adjustment in the contract price *in accordance to paragraph 10.05*, which was not done in this case as explained more fully below*, if all three* of conditions one (1) through three (3) are met. The second condition, at Subsection (2), requires that there can be no other corresponding adjustment with respect to any other item of work. As previously indicated, the Town's position is that previous change orders compensated CAMO for the changes in the work. The trial court agreed. We also agree. The plans and drawings were being revised by Hammett on August 30, 2002, and Change Order No. 3, granting 320 additional days to the contract, was dated September 3, 2002.

Testimony at trial indicated that the change orders requesting additional time covered delays in the past *and* delays anticipated. Hence, in addition to Change Order No. 1, granting 200 days for delays at the beginning of the contract in 2001, Change Order No. 3, granting 320 days extension, compensates CAMO for delays before, after, and at the time the plans were being revised in the fall of 2002. Likewise, Change Order No. 4 compensates CAMO in the amount of $280,164.65 for revisions and modifications in the work.

Pursuant to Section 12.05 of the General Conditions, delays beyond the control of both owner and contractor are compensated by an extension of *time* equal to the time lost, which "shall be the CONTRACTOR's *sole and exclusive remedy for such delay.*" Further, Section 12.06 provides that, "In no event shall OWNER or ENGINEER be liable to CONTRACTOR . . . for damages arising out of . . . delays . . . within the control of CONTRACTOR; or . . . delays beyond the control of both OWNER and CONTRACTOR." CAMO further argues that it should be compensated in price for the delays caused by the conflicting underground utilities under Section 4.03(C) of the General Conditions. That section provides for contract changes in time or price if subsurface conditions are unusual or materially different from conditions ordinarily encountered or of such a nature as to establish material inaccuracies in the technical data relied upon by the contractor. Again, since interference with underground utilities started at the beginning of the work, Change Orders No. 1 and No. 3 granted a total of 520 additional days for delays which specifically included conflicts with underground utilities.

As to an increase in price due to those delays, paragraph 20 of page SC-6 of the Special Conditions in the contract, which override the General Conditions, provides in pertinent part that, "The Contractor shall make his own investigations and be fully responsible for locating and taking care not to damage any gas, water or sewer lines. . . . In case that such physical properties conflict with the performances of the contract, it shall be the *Contractor's responsibility to anticipate such conflicts and to give advance notice thereof to the Owners.*" (Emphasis added). In particular, paragraph 21 of the Special Conditions at SC-7, entitled "Subsurface Conditions," provides: "*Contractor shall make his own investigations of subsurface conditions. No claims for extra compensation due to unusual conditions or development[s] that*

*are found to exist underground will be allowed*." (Emphasis added). Paragraph 9 at SC-3, entitled "Site Investigation," provides that the contractor is presumed to have visited the site before bidding and to be thoroughly familiar with the nature and location of the job, the equipment and quantities of materials needed, and that any failure to acquaint himself with all available information "will not relieve him of responsibility for estimating properly the difficulty or cost of successfully performing this work."

Section 2.05 of the General Conditions, entitled "Before Starting Construction," provides that "Before undertaking each part of the Work CONTRACTOR shall carefully study and compare the Contract Documents and check and verify pertinent figures therein and all applicable field measurements."

Additionally, Section 4.04 of the General Conditions provides that information shown or indicated in the contract documents with respect to existing underground facilities is based on information and data furnished by the owners of such underground facilities, and unless otherwise expressly provided in the Supplementary Conditions, the OWNER and ENGINEER "shall not be responsible for the accuracy or completeness of any such information or data." It further provides that the cost of reviewing and checking all such information, locating all underground facilities, and coordinating the work during construction with the owners of the utilities, "will be included in the Contract Price" and shall be the full responsibility of the contractor.

Likewise, paragraph 11 on page 02221-4 of the Technical Specifications of the contract provides that "it is solely the Contractor's responsibility to verify the exact location, number of utilities, number of lines, etc., prior to beginning construction."

19

Moreover, Section 11.03(C) and Section 4.03, and every other section of the General Conditions dealing with the filing of a claim, whether for changes to contract times or contract prices, requires that the claim be filed in accordance with Section 10.05 of the General Conditions. Section 10.05 requires that written notice of a claim "shall be delivered by the claimant to ENGINEER and the other party to the Contract promptly (but in no event later than 30 days) after the start of the event giving rise thereto." CAMO did not comply with this requirement. CAMO waited until December 13, 2002, eleven days after Change Order No. 4 was issued, to provide written notice of events that started at the very beginning of the contract. The final subsection - D - of Section 10.05, at page GC-27, provides that "No Claim for an adjustment in Contract Price or Contract Times (or Milestones) will be valid if not in accordance with this paragraph 10.05."

CAMO has made much of the fact that on December 17, 2003, Hammett sent a cover letter to the Mayor attaching the original proposed Change Order No. 5, showing a 217-day extension to December 8, 2003, and showing an increase in the contract price for the claim of extended overhead and delay damages. Therefore, CAMO argues that Hammett's signature on the change order constitutes a written recommendation from the engineer that was binding upon the Town pursuant to General Condition 9.08, which provides:

> A. ENGINEER will determine the actual quantities and classifications of Unit Price Work performed by CONTRACTOR. ENGINEER will review with CONTRACTOR the ENGINEER's preliminary determinations on such matters before rendering a written decision thereon (by recommendation of an Application for Payment or otherwise). ENGINEER's written decision thereon will be final and binding (except as modified by ENGINEER to reflect changed factual conditions or more accurate data) upon OWNER and CONTRACTOR, subject to the provisions of paragraph 10.05.

20

As a threshold matter, the claim for extended overhead and delay damages was not for quantities of unit price work performed, nor did CAMO submit a proper claim under Section 10.05. Therefore, Section 9.08 is inapplicable. CAMO was paid for every unit of pipe or other material that it installed. With regard to having CAMO's crew and equipment on the job longer than Grantham anticipated when he bid the job, that is covered in the numerous sections requiring CAMO to anticipate and include all such delays and underground obstructions in his bid price. Hammett testified that during his 22 years as a project engineer, working on hundreds of projects, he had never heard of a contractor being paid "extended overhead."

Hammett further testified that he never made a final decision as to whether CAMO had submitted a claim entitling it to additional money under the contract, nor did he investigate or make any determinations regarding the validity of CAMO's claim. He testified that CAMO's methodology for calculating equipment rentals and some of the percentages seemed fair. However, the charge for one or two man hours a day and increased cost of labor was completely arbitrary and not based on anything. Hammett indicated that he had been instructed to try to work out something with Grantham, and after meeting with him, Grantham reduced the disputed portion of the claim, and Hammett presented the reduced amount in the change order simply because he knew that it was the lowest that Grantham would go.

Hammett specifically stated that he told Grantham numerous times throughout their discussions that he (Hammett) did not have the final say on the claim. Moreover, Section 10.03 of the General Conditions provides that the Owner and Contractor shall execute "appropriate" change orders recommended by the engineer covering changes in the contract price or contract times "which are agreed

21

to by the parties" *and* "which embody the substance of any written decision rendered by ENGINEER pursuant to paragraph 10.05."

As stated, there was no written decision by Hammett pursuant to Section 10.05; indeed, there was no proper claim submitted pursuant to Section 10.05. There was clearly no agreement by the parties since the Town refused to execute the original proposed Change Order No. 5 and instructed Hammett to revise it, deleting the claim for compensation and the 217-day extension of time.

In finding that CAMO had been compensated for its claims in time extensions and price increases in previous change orders, the trial court concluded it was well settled that after adjustments have been negotiated to a contract and agreed upon by all parties, one party cannot subsequently seek additional relief. For that proposition, the court cited *Circle, Inc. v. Board of Supervisors, Sewerage District No. 2, St. Bernard Parish*, 387 So.2d 606 (La.App. 4 Cir.), *writ denied*, 394 So.2d 613 (La.1980). CAMO attempted to distinguish the case, but provided no supporting precedent of its own. Contrary to CAMO's assertion otherwise, the issues and holding in *Circle* are quite analogous to this case. The 1967 contract in *Circle* was a unit price contract. After construction on a public sewerage contract began, the contractor encountered unexpected soil changes and obstructions to installation of the line requiring changes to the proposed construction plan.

Accordingly, the parties in *Circle* negotiated a change order that increased the contract time by 56 days and the contract price by $3,020.01 as compensation for the relocation of some lines and the redesign of others. Subsequently, the contractor sued for additional amounts for the extra work, delays, and changes in the contract. The court determined that the change order involved the entire contractual obligation and was a compromise between the parties after

22

negotiation, and therefore had the force of law. The court in *Circle* articulated that the contractor may have made a bad bargain, but he had made a legally binding bargain. The fact that the change order also provided that the cost for the work could not exceed the contract amount plus a five percent contingency does not create an "entirely different situation" as CAMO suggests.

Nor does CAMO's assertion that the previous change order in *Circle* was dissimilar to the previous change orders in the present case because it was reached only after considerable negotiation and exploration. Change Orders No. 1, 3 and 4, in the present case were certainly the result of much deliberation and extensive calculations, and because they were signed by *both* of the parties to the contract, CAMO *and* the Town, they were binding. Further, contrary to CAMO's assertions, the proposed Change Order No. 5 in the present case was not binding because it was not signed by both parties to the contract in that the Mayor never endorsed it. Accordingly, we find no manifest error in the trial court's judgment dismissing CAMO's claim for additional compensation for extended overhead and delay damages under the contract.

## CAMO's Claim for Additional Time

CAMO further contends that the trial court erred in finding that CAMO was not entitled to the 217 additional days on the contract as indicated in Hammett's December 2003 letter to the Town. The record reveals that the Certificate of Substantial Completion signed by CAMO was issued with a substantial completion date of December 8, 2003. On December 17, 2003, nine days after the date on the Certificate of Completion, Bryant Hammett submitted a proposed Change Order No. 5 to the Town that included the request for the 217 additional days *that had already been consumed*, and the Town declined to grant the extension. The previous

extension of time approved by the Town had expired on May 5, 2003, pursuant to Change Order No. 3. Hence, these final 217 days requested would cover the period from May 5, 2003 to December 8, 2003 and prevent the assessment of the $500.00 per-day liquidated damages called for under the contract.

CAMO argues that it should have been granted the 217-day extension because CAMO relied on a pattern established during construction wherein Hammett would ask CAMO to submit a request for time, CAMO would comply, Hammett would write up the change order, and the Town would approve it, and that Change Order No. 5 should have been no different. More specifically, CAMO's appellate brief to this court provides: "Each time the current time period would be close to expiring, the engineers would write CAMO and ask CAMO to request additional time." This is not an accurate statement. The pattern that had been established was one wherein CAMO would fail to request an extension, as required under the contract, and the Hammett firm would somewhat paternalistically carry CAMO through the process, after the previous extension had already expired.

The record reveals that the initial completion date under the contract for 270 days was December 1, 2001. On December 13, 2001, the project engineer, Capdepon, wrote to Mike Grantham as follows: "This correspondence is to advise you that the contract time for the above captioned project expired on December 1, 2001. Please submit to us, in writing, a request for more contract time for the completion of this project." Grantham complied with this request by correspondence dated December 20, 2001. The result was the Town's approval of Change Order No. 1, dated December 20, 2001, granting 200 additional days from the December 1st expiration date.

24

The new expiration date, pursuant to Change Order No. 1 was June 19, 2002. On July 8, 2002, Capdepon wrote Grantham an almost identical letter advising him that the contract had expired on June 19, 2002, and asking for a written request for more contract time, *and* an explanation for the extension. CAMO did not respond. On July 30, 2002, Capdepon again wrote Grantham with the identical language as the July 8th letter, asking for a written request for time. On August 1, 2002, Grantham wrote Capdepon regarding the June 19th expiration date, indicating that he did not know the extent of remaining changes due to obstructions, and he therefore did not enter a request for time. There must have been verbal discussions, because on September 3, 2002, Bryant Hammett wrote the Mayor recommending a 320-day extension to the contract, and attaching Change Order No. 3.

Change Order No. 3, dated September 3, 2002, extended the contract expiration date from June 19, 2002 to May 5, 2003. Revised plans were being drawn up simultaneously with Change Order No. 3, indicating that the Town looked for completion of the project on the date of May 5, 2003, as provided for therein. On December 2, 2002, when Change Order No. 4 was issued for the $280,164.65 increase in contract price for CAMO's quote on the additional Items 19-22, most of which were due to the plan revisions, there was no request for additional time, and the expiration date of Change Order No. 3 remained the same, May 5, 2003.

For the first time, on May 2, 2003, three days *before* the expiration date of the May 5, 2003 deadline, Bryant Hammett wrote Grantham *in advance* that there was "a growing anxiety among town officials and the Mayor that the work initially begun will not be completed this summer." The second paragraph reminded Grantham of the specifics of the previous extensions and change orders and then stated, "To date this project is not finished." In the third paragraph, Hammett asked

Grantham to submit "a completion project schedule detailing the work remaining and time frame for completing this project." He then asked for a written request for more time, with an explanation, and asked for Grantham's help in completing the project in a timely manner due to the inconvenience the project was causing the residents.

On May 19, 2003, two weeks *after* the expiration of the contract on May 5, 2003, Grantham responded to Hammett's May 2nd correspondence, providing reasons for the previous extensions and expressing his own anxiety over his December 2002 letter asking for extended overhead and delay damages. Grantham still did not request an extension time, stating that in order to do that he would need to know whether the additional streets discussed the previous year were going to be added. At trial, Grantham testified that, at that point in time, he did not know how much time to ask for, so he did not put a time in the letter.

In another letter dated the same day, May 19, 2003, Grantham wrote Capdepon, asking for a punch list of items to be addressed, and asked that any additional streets should be made part of the punch list. On June 20, 2003, Capdepon sent Grantham the punch list comprised of four-and-a-half pages of items to be completed, but the additional streets were not added. Grantham was still laying pipe when he received the punch list. The record contains no evidence that Grantham ever provided the engineers with a written request for an extension of time, though there is correspondence regarding his claim for extended overhead and delay damages in October 2003.

Section 12.02(A) of the General Conditions provides that the contract times may only be changed by a change order or written amendment, and, any claim for an adjustment in contract times "shall be based on written notice submitted by the party making the claim to the ENGINEER and the other party to the Contract in

accordance with the provisions of paragraph 10.05." CAMO did not comply with Section 12.02(A) under its own volition for the first two extensions of time. Rather, it had to be asked to comply after the expiration of the contract. That was the actual pattern that had been established. For what might have been the third extension of time, even though he was pleaded with prior to the final expiration on May 5, 2003, CAMO *never* provided the written request to the engineers as required.

Section 12.02(B) provides that any adjustment to the contract times will be in accordance with the provisions of Article 12. Section 12.04 provides that the contract times will not be extended due to delays within the control of the contractor. Even though the engineers, Hammett and Capdepon, took full responsibility for their drawings, the Town's position is that CAMO was granted 520 additional days on the contract for delays beyond its control, and that some of the delays were the fault of CAMO, including its failure to verify information in advance and to allow for interference with utilities in its bid as required by the contract. Moreover, the Town's information demonstrated that out of the 1007 days between the contract start date and the Certification of Completion date, CAMO was on the site for only 392 days, and that only around 100 days were attributable to rain-out days. CAMO argued that its records indicated 435 days on the job, asserting that the Town failed to include wet days following the rain-out days and failed to include the work done prior to the beginning of construction. The trial court agreed with the Town's position, and the record supports the trial court's findings.

With regard to the proposed Change Order No. 5 that Hammett and CAMO signed requesting a 217-day extension of time and the price increase for extended overhead and delay damages, the Town apparently did not receive the request until December 17, 2003, when Hammett attached it to his cover letter of the

27

same date. By that time, the 217 days had already expired, and the completion certificate had been executed. Once the Town received the request, it began to investigate, and found that the reports did not support either the time extension or the price increase requested pursuant to CAMO's claim for extended overhead and delay damages. Therefore, the Town never signed or approved the original proposed Change Order No. 5. For all of the reasons discussed above, proposed Change Order No. 5 was not binding. Therefore, the Town was authorized under the contract to deduct liquidated damages for the unapproved 217 days between the contract expiration date on Change Order No. 3, which was May 5, 2003, and the date on the Certificate of Substantial Completion, which was December 8, 2003.

CAMO argues that if it is found liable for liquidated damages, that such damages should not be imposed beyond September 8, 2003, at which time it sent correspondence to Capdepon that the pipe was installed pursuant to the drawings and that CAMO was currently working on punch list items and dressing up recently installed piping. However, the record also reveals that CAMO did not request the Certificate of Substantial Completion until October 30, 2003. The Town chose to impose liquidated damages only to October 12, 2003, which was a date nearer to the first date scheduled for the pre-final inspection, which was October 9, 2003, pursuant to Capdepon's letter to the Mayor. The record indicates that the pre-final inspection had to be rescheduled to December 8, 2003. Notwithstanding, the Town still chose to deduct only 160 days of liquidated damages through October 12, 2003, for a total of $80,000.00. The trial court determined that this was more than fair. We find no manifest error in its judgment.

IV.

## **<u>CONCLUSION</u>**

Based upon the foregoing, we affirm the trial court's judgment dismissing CAMO's claims for additional compensation for extended overhead and delay damages and for additional time on the subject contract with the Town of Vidalia. All costs of this appeal are assessed against plaintiff-appellant, CAMO Construction Co., Inc.

**AFFIRMED.**